Our final case this morning is No. 24-1286, E&I Global Energy Services v. United States. Mr. Whitcomb. Your Honor, if it pleases the Court, my name is Joe Whitcomb. I represent E&I Global on its case against the federal government for termination for default. This is the second time we have been to this court on this particular case. The first time the court remanded it back down to the trial court. The trial court, in the second instance, found a different basis for denying E&I's claims. So what are you seeking? We all know the history quite well. What are you seeking here? I mean, the court granted summary judgment to your friend. So you're here to vacate the summary judgment. Are you looking for a trial? Is your argument that there shouldn't have been summary judgment because there are factual disputes, material factual disputes that need to be resolved through trial? Or are you arguing you should go back and they should award summary judgment in your favor? So I think that there are factual disputes, Your Honor, but I also think that there are legal disputes that should be decided to go by this court. And I've argued that in our briefing, specifically as it relates to E&C's assignment under South Dakota law, because the original completion contract was governed by South Dakota law. Obviously, there's a lot of intersections going on here, Your Honor, and there are multiple names. But Mr. Bruce is the principal and remains the principal, or I'm sorry, not remains, was the principal for E&I and E&C. The government took the position that it only learned on the eve of trial that E&C and E&I were different companies. That is just categorically untrue. But the Eighth Circuit case has resolved the argument that E&I was a party to the agreement with the sureties. That case is unwritten, and that was only filed last week. Okay, but that's what the case decides. So let's assume that that's correct for the moment, or that you're collaterally stopped from arguing otherwise, and that you weren't a party to the surety agreement. As I understand your argument, even if we weren't a party to the surety agreement, we could still rely on the fact that the sureties would perform their obligation to pay the subcontractors, and that that was reasonable to rely on that. And let's assume for the moment that you're right about that, that it was reasonable to expect the sureties to pay to the subcontractors. I'm not understanding how that caused delay in your performance. Thank you, Your Honor. So the history of this case is, so E&I gets a notice to proceed in May of 2016. It gets on the job, by the way, before that time, between the December 2nd termination date and the May notice to proceed, E&I is essentially, and its owners are essentially foreclosed from coming onto the property. So the court's rulings over and again are that it was foreseeable for E&I. But address my question. What is the evidence that the failure to pay, the surety's failure to pay the subcontractors caused delay to you?  So that, thank you, Your Honor. So in February of 2018, which was two months before the completion date, E&I complained, and it's in 1737 of the appendix. E&I, Mr. Bruce complains to Mr. Dittmer that he is essentially out of cash, that it doesn't have money to proceed. It all has to do with the fact that you didn't have enough money. Which is because, and you. Yes. I'm sorry. It all has to do with the fact that you didn't have enough money because you had to pay the subcontractor. And the use of the word subcontractors comes up over and over in this case, and I think it's. Let's try to answer my question.  I want to understand. Is the argument that the failure to pay the subcontractors caused you delay because it caused you to have to pay the subcontractors to get them to continue, and the payment itself caused delay? Yes, Your Honor. But it's subcontractors, and importantly, the word that's sort of used interchangeably, material. So there was like a nine, there was over nine, almost a million dollars of excess cost that were not, that E&I took to. By the way, not in February, but in July. In July of 2016, Mr. Bruce takes the claim to Liberty Mutual and says, look, at the time, they had recognized something in the tune of a half a million dollars in equipment, and the lower court uses the term over and over again. Can we just stick with the subcontractors for a moment, though, please? My understanding is that you get the contract, and they say, oh, my God, these subcontractors have not been paid by the sureties yet, so they're not going to work for me on this new stuff. So you feel compelled to pay them out because the sureties have failed to pay them. Is that right so far? That is one thing, yes, Your Honor. Okay. And then you don't have enough money to continue because you've spent all your money paying them. And so the court, the Court of Federal Claims, it seems to me that under their opinion, even if it was unforeseeable that the sureties weren't going to pay up the contractors, if you paid them, didn't you realize when you were paying them their back pay that you weren't going to have enough money going forward? The Court of Federal Claims faults you as not being reasonable because you should have known you didn't have any money, and you're saying that the subcontractors would be more expensive, but you provide no proof of that. There's two arguments at vantage, Your Honor. And remember, the reason that E&I was terminated was not for failure to perform. WAPA has never advanced the idea that E&I did not perform. Its basis for termination was exceeding the not-to-exceed date. In fact, WAPA conceded in February of 2018, two months before the not-to-exceed date, that E&I was 93% completed. When WAPA terminated E&I, Is that because it didn't perform on time? That's right. It didn't finish that not-to-exceed date, call it the middle of April of 2017. E&I finished without objection from the government. What relevance does that have to the reasonableness of E&I's actions when assessing whether there was an excusable delay? I don't understand your question, Your Honor. It's what did the non-payment have to do with that? WAPA was aware of the non-payment. It was the nature of the termination. You were pointing out that E&I was terminated not because it stopped working or wasn't doing any work. It's because it didn't perform on time. And I just don't understand what that has to do with assessing reasonableness when we're looking at whether there was excusable delay. Okay. Thank you, Your Honor. So the excusable delay goes down to, and I've argued this in a brief, by the lower court's analysis, E&I would have had to anticipate that Liberty Mutual was going to breach its contract with it. I would accept that you're right about that. Let's assume that you reasonably expected the sureties to pay. The sureties didn't pay, and that caused a problem. Where's the nexus between that and not performing the contract on time? Because you, in fact, paid the subcontractors, and they started work, right? There's no allegation that the subcontractors started work late, correct? No, there's no allegation of that, Your Honor. You're right. In February of 2018, which is when all of the events sort of crescendoed to a climax, so from July until February, E&I had been engaged in a fight with Liberty Mutual, trying to get payment for material men and subcontractors for almost $1 million worth of equipment. To the court's point, it had already paid the subcontractors, but in paying the subcontractors, it was left flat-footed in its attempt to pay for material men. So the provision in the contract that Liberty Mutual did not comport with was materials ordered and not paid for. You had an option, assuming that you're correct, that the failure to pay the subcontractors delayed your work and that it was reasonable for you to wait until the subcontractors were paid so that they would start working for you. You made an election, a choice, to pay them. You weren't obligated to pay them. You could have sat around and said, you know, the sureties are delaying us because the subcontractors aren't going to work. You didn't do that. No, Your Honor, you're right. Instead, he pressed forward. Actually, E&I continued to perform. They actually did the work. I mean, the government's argument, and it seems like the court might be advancing this idea, that E&I would have been in a better place had it sat on his hands and done nothing. But instead, Mr. Bruce, wanting very much to impress WAPA and move forward with this contract, continued to perform. But that's his choice. It's not a choice that was inflicted on you by the circumstances or by the government. Your Honor, it's 100% true, but the point is that E&I did continue to perform until it literally no longer could. It literally no longer could because it didn't have the money to proceed? In February of 2018, that's correct. In February of 2018. And you're saying it didn't have the money because it paid the subcontractors? And material men. It had paid subcontractors early on. It had paid subcontractors in the early performance of the contract back in May. And what was the other reason besides pay? The material men, so they paid for $400,000 worth of steel. They paid for a lot of other things, materials that, again, the lower court kept saying, well, E&I should have known that that material was missing. That misses the point entirely. The materials were ordered, were purported to have been ordered. This is a situation we're talking about, a 19-acre electrical substation. This stuff is not coming from the local Home Depot or Lowe's. It's being shipped in. This one is where it seems to me like maybe it could have been foreseeable. It's my understanding. Do I remember correctly that for this particular factual assertion, the claims court was saying this information would have been available had E&I looked for the information? No. So this is why this is so upside down and backwards. After this court, or actually the moment after the Court of Federal Claims in the first instance rejected E&I's claims, that was we had a trial in November of 2021. Right after that November 2021 trial, Liberty Mutual comes forward with evidence with four CDs of information that WAPA had given to the surety to hand off to E&I, and they had not given it to E&I. So E&I was operating without, based on, again, there were completion contracts. So the surety provides all of the information to E&I that it's going to rely on to put its bid together. Is this part in the record? I mean, like in the record before us today? I'm sorry. Is this what you're talking about in the record before us today? Yes, sir. Yes, it certainly is. Can you mention this in your briefs? Yes, sir. We do talk about this in our briefs. So, again, there were representations made. In fact, the reason that E&I lowered its bid from $7.5 million to $5.5 million was because the surety made representations to it that $2 million worth of equipment was already paid for that wasn't. So when E&I got there and learned that this equipment was actually ordered, which is pursuant to the contract, but was actually not ever paid for, and it did not learn that until after the notice to proceed had been, until the government issued the notice to proceed. Then it didn't take it up with the government. It did what it was supposed to do. It goes to Liberty and says, hey, Liberty, pursuant to your contract, you're supposed to pay for this equipment that was never paid for, that Isilux, this foreign corporation, ordered, put in orders and never paid for it. But we took it out of our bid because you told us it was paid for. And Liberty Mutual, if you look at 1737 in the appendix, Liberty Mutual acknowledges, Liberty Mutual's representative, Ms. Banks, writes Mr. Dittmer and says that exclusion provision in the contract is in the definition section and it doesn't obligate E&I to anything, or sorry, doesn't obligate Liberty Mutual to anything, which is a complete misreading of the contract, obviously. But Mr. Bruce, at the time, in February of 18, is under the impression that WAPA withheld the information. He's doing, he is in the, in talking to Mr. Dittmer and his staff, believing that it was WAPA that withheld the information. He only learns later, I mean years, two, three years later, that it was Liberty Mutual that withheld the information. And so the only idea, the whole, I think, idea for the court to decide is whether or not Mr. Bruce behaved reasonably. He completed the contract. There is no assertion that he didn't. And how late, what was the delay? The delay was in February of 18. He runs out of money. He is 93% done. He is trying diligently. Just tell me the amount of time the delay, how late, how long. Oh, it was about 45 days from, he completed the contract. He actually completed the contract by the end of May and the literal moment that he finished the day that they came down from the boom to finish the electrical portion of the contract. Just tell me how, he finished in May. When was he supposed to finish? Middle of April. The middle of April. He was supposed to finish in the middle of April. The government said nothing in the middle of April. The government said something in the middle of February because he had drawn his people down and gave them a notice to cure. He responded to the notice to cure. He continued to perform in the middle of April. They say nothing. They let him continue to perform. And when he's finished with the project, when there's nothing left but a punch list, they come on the job on that day and order him and all of his people and all of his equipment off the site. This is not in the record. This is a little tangential. He later comes back in July and finishes the punch list. But that is actually not in the record before this court. But the point is… I think we're out of time. We'll give you two minutes for rebuttal. Thank you. I appreciate your time. Thank you. Thank you. Mr. Kerr or Carr, how do you pronounce it? I'm sorry? Is your name pronounced Kerr or Carr? Kerr. Thank you, Your Honor. May it please the court. There is no genuine dispute of material fact in this case. One of the arguments you make just doesn't make sense to me. Why is it that they couldn't rely on the sureties to perform their obligations and to pay the subcontractors, even if they had no contractual relationship with the sureties? I mean, surely under these circumstances you could say, well, sureties are obligated to pay the subcontractors. We expect that they do that in a reasonable amount of time. Why isn't that reasonable? Well, they allege that the sureties didn't pay the contract. But to the extent that they're a third party to the contract, then they're trying to rely upon it. So what if they're not a party? The situation that they expected to happen, sureties paying the subcontractors, is a reasonable assumption, right? That's a reasonable assumption. But because they're a third party to that contract, they have to take that. There's reasons for delay related to the weather, right? That's correct, Your Honor. And so there is no contract between the appellant and the weather, right? I mean, so a contract isn't required, right? So why does there have to be a contract between the appellant and the sureties? The court of federal claims, the point I read its opinion to be making is that that has some bearing, that the fact that they're a third party has some bearing on how much they can rely upon. But we're asking you, your view, and what law you have to support that. We're suggesting we think that's wrong. So what is your response to that? I mean, I agree with the court of federal claims. This court has held that that's not dispositive, that you're a third party to a contract. But it is a data point on how much, how reasonable. Let's assume that it was reasonable for them to rely on the allege. Maybe a trial would show differently. But there was, facially, there's an allegation that they relied on the sureties, that it was reasonable to rely on the sureties. Let's assume that's a sufficient allegation, okay? And that there's evidence to support that. So what argument do you have left under those circumstances as to why their failure to perform on time was not excusable? Well, as the court of federal claims said, it was they did not, E&I did not take reasonable steps, once they realized that the subcontractors were unhappy, did not take reasonable steps to find new subcontractors. It did not take reasonable steps to find another way of performance. And this court remanded for development of the factual records, and in our interrogatory questions, in our interrogatories, we asked. Are you suggesting that it was unreasonable for them to pay the subcontractors? Your Honor, under the completion agreement. Don't we look at the reasonableness of what they did, not whether other options would have been reasonable? Under the completion agreement, they weren't supposed to pay. I know, but what is your argument for why it was unreasonable? Why what they did was unreasonable? With the fact that it's a voluntary payment that they made, and it's unreasonable because they weren't supposed to make that payment. They weren't liable. What should they have done? They're faced with a situation where there's reasonable reliance on the fact that the sureties are to pay the subcontractors. It doesn't happen. What are they supposed to do? Well, this court pointed out one thing they could have done is find other subcontractors, and that's what we asked them in discovery. Did you look for other subcontractors? And they said no efforts were made to look for other subcontractors. They didn't even inquire. How does that show that what they did was unreasonable? I mean, what is the legal inquiry you're supposed to make? Are we supposed to say, hey, you could have done something else, so what you did is per se unreasonable, or are we supposed to look at what they did and determine whether it's unreasonable? The law does require them to make reasonable steps to avoid the default. Okay. So you have to show that it's unreasonable what they did, right? Not looking for an alternative. Did the Court of Federal Claims find that what they did was unreasonable? I'm trying to think of the way it was worded, but that's what the Court of Federal Claims was getting at when it said that E&I admits that no attempts were made to locate alternatives. That was ‑‑ So as a matter of law, that proves that what they did was unreasonable. Right. The law requires them to ‑‑ I mean, that's what we have to conclude, right? Well, that's correct, Your Honor. The law requires them to take reasonable steps. We've pointed out that they didn't take any steps. No, no. Well, what the Court of Federal Claims says is, that replacing subcontractors would actually have been more costly. The Court cannot grant relief based on conjecture. Well, we didn't have a trial. Well, that's correct, Your Honor, but that's responding to an argument in their briefs. So we made the argument. We pointed out. We asked in an interrogatory, we asked E&I, what steps did you take to locate other subcontractors? Well, why did they need to locate other subcontractors? They paid out the others. As things turned out, they were delayed only a couple months, but they were using the same contractors, right? That's correct, Your Honor. So your position is they acted unreasonably because they should have hired new subcontractors, and that would have meant that there was no delay in completion? They should have looked for new subcontractors. The other subcontractors, E&I claims, refused to respond. Now, that's not even part of the record. There are no details about these subcontractors refusing to perform. That's just E&I's allegation. They're not even, it seems to me, alleging that the subcontractor's refusal to perform delayed them. As I understand it, the sole argument is that because they had to spend money to pay the subcontractors, they couldn't finish the job on time, right? That's my understanding of their argument. Yes, Your Honor. So the question is, is it reasonable that they paid that money? It was a voluntary payment. Was there any evidence that it was foreseeable that they would run out of money if they paid the subcontractors? Any evidence in the record? Any evidence that it's not foreseeable? Well, that they'd run out of money? Yeah, I don't know. E&I claims that they lowered their bid. I'm sorry, that's on the equipment's argument, so I'm confusing. I'm just trying to figure out whether it's reasonable or unreasonable as a matter of law, you know, since it's a fact question. Do you agree that whether a party behaves reasonably would normally be considered a fact? It is a fact question, but there's a legal standard that E&I has to take reasonable steps. Oh, wait, I understand. There's a legal standard that you have to take reasonable steps, so whether something is reasonable is a factual question. Yes, yeah. And so do you have a legal standard on when something's reasonable? I don't think so. Yeah, I don't, Your Honor. This court remanded to the Court of Federal Claims to develop a full record, and E&I has not done that. They haven't developed an argument about the subcontractors refusing to perform because they weren't being paid. Have they even identified which subcontractors? That's not in the record. You're saying they shouldn't get a trial on it. They shouldn't be able to prove their case. We're saying there are no facts in dispute that would allow them to prevail at a trial. They're saying it's unreasonable to hire subcontractors. Right? And you're saying it's unreasonable to hire subcontractors. It was unreasonable to make. It was a voluntary payment, and they didn't have to make that payment. Was there a cross-motion for summary judgment? I don't believe so, Your Honor. Well, if they hadn't made the payment, what would have happened to the contract? Well, the Court of Federal Claims points out that E&I that they took steps to enforce the sorority provisions. But they weren't a party to the contract. Well, at the time they were claiming they were, and they filed a lawsuit against the sororities. So you said they took no steps. They did take steps. They filed a lawsuit. But, Your Honor, the lawsuit was in 2020, two years after their default. Why didn't they file the lawsuit back in the day when they wanted to enforce the sororities? You don't think filing a lawsuit would have caused delay? They would have never gotten close to completion date if they had filed a lawsuit trying to get the money back, right? If the lawsuit, yes, went to fruition, you're correct, Your Honor. But maybe the sororities would have settled early. Why was that a reasonable alternative? I mean, that would be a step that they could point to, that they were getting the sororities to do what they alleged wasn't being done, is filing a lawsuit. But the point is whether it was foreseeable, the question is whether it was foreseeable that these sororities were going to default on the payment they owed. Saying, well, they should have filed a lawsuit, doesn't answer the question of whether or not it was foreseeable. The question is then, the second question is, it wasn't foreseeable, but did you act reasonably, right? On the foreseeability issue, E&I was aware that the sororities were making payments reluctantly, I believe they said. So they were aware that there were problems with the sororities making payments to the subcontractors. When were they aware of that? Before E&C signed the completion agreement. They were aware that the... Did the agreement provide that the sororities were going to pay? I'm sorry, before E&I filed the follow-on agreement. I'm sorry, Your Honor, could you repeat your question? When E&I became involved, the sororities had recommitted to pay, right? But E&I says in their brief that even though they had committed to pay, they were making the payments reluctantly, that they were slow in coming and that the subcontractors were unhappy. And at that time, E&I did not look for other alternatives to those subcontractors, took no steps to look for other alternatives, which under the law they're required to do. But that's what they say, but that's conjecture, because they didn't even look. They didn't even ask. And if they had asked and if it was more expensive, that would be evidence that we could look at before the court. Why was it unreasonable for them to pay? Why didn't you get the money back later? Well, it was unreasonable if it prohibited them from finishing the job. What evidence is there that they knew it would prohibit them? Well, that's what they're claiming. I don't think there is evidence. There's, in fact, a lack of evidence in this case about this whole issue because E&I hasn't put forward the evidence. E&I hasn't put forward the evidence it needs to affirmatively prove its case because it hasn't shown the details of this dispute with the subcontractors. How serious was this refusal? Why didn't you get a motion for a summary judgment? And, again, you haven't shown that they should have known that they were going to run out of money and not be able to complete the contract. Well, yeah, Your Honor, we don't have enough information to say they should have been aware that they ran out of money. That's the way they're operating their business. On the equipment issue, the documents show that the equipment was not ordered. Opposing counsel is claiming that there's evidence that the equipment was ordered, but the documents show the exact opposite. The documents they're attempting to rely on say that the orders are under review. And Mr. Bruce, in deposition, admitted to some of the big pieces of that equipment, that he knew that that was on E&I to order. He knew it wasn't on, that Isilux hadn't ordered it. Also, Mr. Bruce conducted a site visit, and E&I was a subcontractor. So they had knowledge of what was going on on the site, and it was foreseeable that that equipment hadn't been ordered, because that's what all the evidence was pointing. They haven't pointed to any evidence that shows that it was ordered. And on the schematics, they claim that they... Did they ask the government for a time extension as a result of their problems with the subcontractors and their difficulty in having enough money to complete? I'm sorry, Your Honor, I'm not sure. I mean, I think they asked for an extension, but I'm not sure what they asked for. Because by that time, the subcontractors were already performing. They were, you know, they... No, but when they were running up against the deadline, and they ran out of money, did they ask for an extension of time so that they could raise enough money to complete the contract? I don't know, Your Honor. I'm sorry. And quickly, on the schematics, they claim that they spent from June of 2017 to July of 2017 procuring these schematics that allegedly weren't in the first email or the first CDs. And they didn't make the claim that that was a cause of the delay until 2023. So that clearly waived. They needed to make that delay claim immediately and waited through. They didn't make it in their certified claim and waited until 2023 to say that was a reason for the delay. You agree that on summary judgment, all factual inferences have to be made in E&I's favor, right? Yes, Your Honor. Yeah. I wasn't here for the first round before our court. So there were lots of other issues in dispute, I assume, in terms of involving what money is owed or not owed. That's all off the table. That's been done. And this only issue is whether they should be stung with a notice as a defaulter. Is that what this is about? Yeah, that's correct, Your Honor. So they had several other claims. This court affirmed the dismissal and summary judgment grant and trial on some of the claims. Well, there's money involved here because what they're saying is if they were improperly terminated for default, it should be a convenience termination, in which case they could potentially get money, correct? Potentially. They haven't made an application for termination for convenience. And they haven't said what money they say they're entitled to. If it's 93, I think, was the number opposing counsel. 93% complete. I haven't seen what they claim they're entitled to if it's converted to a termination for convenience. Okay. Thank you. Thank you. Mr. Witkin. Thank you, Your Honor. But was there a request for a time extension to the government in order to raise more money so your client could complete the contract? So, yes, Your Honor. So I brought to the attention to the court February 18th. It's in the appendix. So, again, at the time, in February. Where do we find this? Let me find that. I wrote a bunch of numbers down here so I could find everything. I think it's 1524. It's a ‑‑ let's see if I'm right about that. I might be going to a deposition piece here. It's marked, the document that I'm referring to, Your Honor, is marked with the four WAPA folks. Basically, E&I sends a claim to Liberty Mutual in July. On 9-11 of 2016, E&I says in writing, expressly states in that document that we have tendered. Where's the request for time extension? I'm finding it, Your Honor. I'm finding it. It's a ‑‑ I wrote down so many pages that now it's not terribly useful to me. So, first of all, again, if you look at the exchange, it's 1737. That is an exchange between Mr. Dittmer and Ms. Banks. And in that exchange, Mr. Dittmer is making a ‑‑ Do you have the actual document in the record? I'm sorry? Do you not have the document in the record? I do. The document I'm referring to, the February document, I do, Your Honor. Did you say 1737? 1737 is the exchange between Mr. Dittmer and Ms. ‑‑ And what part of it is 1737? So, 1737, if you see there, that's dated February 7, 2018. And that's from Jonathan, who's Mr. Dittmer. He's writing Ms. Banks. And, pardon me, that is Ms. Banks writing Jonathan. And that's where she specifically writes. And we've raised this several times in all the courts that will listen. As you know, this tender grant, this is a project that's subject to a tender grant wherein E&I LLC was tendered for the completion of the project. That's one of the many instances that we raised. Where does this say we need more time? Sorry? Where does the E&I say it needs more time? So, there it is. So, it's the page before. 1736? 1575. It is a copy of the claim that is filed. Wait, wait, wait. What page? It's the page just before. So, I had you open the 1737. 1575 is just a ‑‑ It's a cover page, right? E&I Global, that's the cover page for the claim where they ask. Also, there's ‑‑ We don't actually have it, right? You don't have the voluminous claim. It's like a 500‑page claim. We don't need to know where you ask for time. Mr. Dittmer concedes in his deposition. The regulations require that you request a time extension, right? Yes. Yes. Okay, so where is the request? So, that is actually, Your Honor, that was dealt with by this court and the lower court, the first iteration, the first at bat. So that the first time it raises the issue that it asked for the delay, that issue wasn't on appeal in this instance. But in the first instance, it was on appeal that Mr. Bruce asked Mr. Dittmer for a delay and Mr. Bruce responded that it wasn't called for. Now, as it relates to the emails with Ms. Wythe, Mr. Bruce alerted Ms. Wythe the very next day that the email that she sent him with the schematics did not come through and he was unable to open it. He not only alerted the government to them timely, he did it in essentially the same day. And there were about four different exchanges on these emails and that is in Ms. Wythe's deposition, which is on page 18. I'm going to use my glasses again. That's on 1826, starting on 1826. Where did we treat this issue in the first appeal? I'm sorry. Where in our opinion on the first appeal did we treat this question of whether there was a request for a time extension? In the remand, I didn't have that page marked, Your Honor, as far as that request. Okay, never mind. I'm sorry, Your Honor. I wasn't prepared for that question. I wanted to address the singular issue that the courts brought up a couple of times about the reasonableness of paying the subcontractors. There's no universe in which E&I could have gotten this work completed in time. Even the court suggests in its ruling, it says in dicta, even assuming E&I could get other subcontractors in this rural environment. If it did, again, the big money expenditure was actually in the material money. If you go through Mr. Dittmer's testimony, we walked through each one of those receipts. Mr. Bruce showed WAPA in February of 2018 $965,000 or $85,000 worth of canceled checks that E&I wrote for materials that it was not supposed to pay for. It did so throughout the performance of the contract. That is why by February, it was out of money, had to shrink its staff. It did keep performing. I'm sorry to interrupt you this quick. Your real allegation isn't about whether or not you had the money for subcontractors. It really involves the money and the dispute that existed with respect to the material, not with respect to the subcontractors. It is in some part. Some contractors, when they came up, they all had ratification agreements. Can you just answer my question? Yes. Was it largely because – Yes, Your Honor. Largely a result of the who ordered what when for the materials and not with respect to who went to hire subcontractors? Yes, Your Honor. As an overall percentage of money, unexpected money that E&I laid out, the vast majority of it was for materials. That's why I said earlier that material men and subcontractors were kind of used interchangeably. The vast majority of that money was laid out for materials. Some money at the very beginning of the performance of the contract was laid out for disgruntled – so there was a ratification of 13 subcontractors. But E&I only – I'm sorry, Liberty Mutual – You're talking about a lot of different stuff. I just want to make sure that I understand. You've set forth multiple reasons for why there was an excusable delay. One of them is that you had to pay subcontractors. Is that one – are you giving that one up now and saying, no, no, the real reason is because we had to pay for this material? I want to make sure I understand what you're saying because you're getting distracted with all the facts.  I'm sorry. So it's both things. So one thing that's important to understand is that E&I was – or Liberty Mutual was only going to pay subcontractors that it was obligated to pay under the Miller Act. It wasn't going to pay subs that it didn't have to pay under the Miller Act. So it paid Tier 1, Tier 2 subcontractors, and it only paid Tier 2 subcontractors that had filed a timely claim within the three months. So you're arguing that that was a reasonable action that you took. That's right. And then separately you're saying it wasn't foreseeable that you would have not – that you would have had to pay for the material as well. Almost a million dollars for the material. Some materials, yes. The court blow found differently. The court blow? It was foreseeable, right? That's right. And how do you challenge that? So it's the factual analysis that the court does. So the court says, for example, E&I did a walkthrough on December 20th. In that walkthrough, it would have – and I argue this in my brief. Intuitively, E&I couldn't have seen materials that would have been theoretically in transit. There would have been no mechanism for inspecting materials that would have been in transit. It would have only been able to inspect materials that were on site. And Mr. Bruce testified, and it's undisputed, Mr. Bruce testified that there were materials inside crates that he could not physically inspect. Now, he – and there was snow on the ground, and he also testified that – and this was included in the governance record. He testified in the Liberty Mutual trial and in his deposition here that on the termination date of December 2nd, 2016, WAPA comes in, basically, he describes a few SUVs, pulls up, pulls all of the documentation off the site, and orders everyone off the site that day. And that's in Mr. Bruce's deposition near the end when I'm cross-examining it. And so he says, look, of course he didn't have an opportunity to hold onto materials. He was a subcontractor at the time. So he – fast forward to December 20th. He does a one, two-hour walkthrough on a 19-acre piece of land. Help me because I'm – this is very confusing. I'm sorry. And your contention is we were delayed in performance because the client ran out of money. Yes. But did he ever say, I need two weeks to raise money, or if you give me a month, I can raise money? I mean, did he say that if he were granted a time extension, he could perform? Or is he just saying, I can't do anything because I don't have enough money? No, the former, not the latter. So he kept people on the ground. He continued to perform. He pressed Mr. Dittmer, believing at the time that it was Mr. Dittmer or WAPA that had withheld the material facts that he needed to actually bid on the job. There's a meeting that's in the very beginning of this appendix where Mr. WAPA, Mr. Dittmer, Mr. Bruce, a bunch of the WAPA staff are having a conversation. Mr. Bruce tells Dittmer, hey, you withheld a bunch of information. Dittmer says, no, I gave it all to Liberty Mutual. We did not find out that that statement was true until November of 2021, three years after – I think we're out of time. I'm sorry. Thank you.